Hinkle, J.
Plaintiff Michael Graney was injured in a bicycle accident which occurred on land maintained by defendant Metropolitan District Commission (“MDC”). The matter is now before the court on defendants’ motion for summary judgment. After a hearing, for the reasons stated below, defendants’ motion is DENIED.
BACKGROUND
The undisputed material facts as established by the summary judgment record are as follows.[2]
*493 The Southwest Corridor Park (the “Park”)[3] is a five-mile, 60-acre park. It extends from Forest Hills in Jamaica Plain to Copley Square in Boston, passing through the South End. The Park is an active and passive recreation park. It consists of open green space, basketball courts, tennis courts, spray pools, a public skating rink, a street hockey rink, two amphitheaters, a bicycle path, a pedestrian walkway and 180 community garden plots. Most of the Park is adjacent or superjacent to tracks used by the Orange Line of the Massachusetts Bay Transportation Authority (“MBTA”) and Amtrak, and to various city streets. No fee is charged for use of the Park.
The Park, or at least the relevant portion thereof, is owned by the MBTA[4] and the MDC is responsible for all its maintenance and repair.[5] A staff of five persons perform the maintenance work, which includes maintaining recreational facilities, plants, benches, lighting, trash receptacles and the irrigation system and removing snow.
An extensive irrigation system runs the length of the Park, consisting of underground piping and sprinkler heads at or near the ground surface. The MDC’s trucks often cannot drive over the grass because they would damage the sprinkler heads. Thus, vehicles or other items are sometimes in the bike path or the walkway for short periods while maintenance and repairs are carried out. At times, mulch is left on the bike path for a short period before maintenance staff attend to the mulch.
The bike path has no hills, and the posted speed limit is 15 miles per hour.
Plaintiff lives in Jamaica Plain near the Park, and at all relevant times used the bike path regularly. His principal mode of transportation was a bicycle. Plaintiff worked evening hours and returned home at night. On June 16, 1996, at about 9:00 p.m., while he was returning home, plaintiff collided with a pile of mulch which he did not see and which was in the middle of the path, completely obstructing the lane of travel. The pile was several feet high and as wide as the path (approximately six feet). Plaintiff could not see the pile because it was after sunset and thus dark.[6] As a result, plaintiff broke both elbows and was out of work for six weeks. His elbows are permanently damaged. The mulch pile had been there for about a week before the accident, and plaintiff is aware that an individual had previously been injured when his bicycle hit the same pile.[7]
The Park came into being as a result of the Orange Line Relocation project. By that project, the MBTA relocated some 4.7 miles of Orange Line track to the Penn Central Corridor and replaced a four-track intercity and commuter railway with three tracks. The new transit and railroad tracks consist of partially and fully depressed sections. The then-existing elevated Oránge Line structure was removed. The cost of the project was estimated to be $671,900,000. The Urban Mass Transportation Administration ("UMTA”) of the Federal Department of Transportation agreed to provide $481,500,000 for the Orange Line portion of the project. The Federal Railroad Administration (“FRA”) agreed to provide $62,000,000 for the intercity railroad portion of the project. UMTA’s funds were to be provided under the Interstate Transfer Provisions of the Federal Aid Highway Act of 1973; the FRA’s funds were provided by Congress for the Northeast Corridor Improvement Program.
According to a UMTA memorandum, Federal funding of the Orange Line Relocation project was justified by user benefits (including reduced travel time and relief of congestion), operating cost savings and urban area benefits. The urban area benefits included community development. A Southwest Corridor development plan referenced in the memorandum identified “parcels to be jointly or independently developed for commercial use, public facilities, housing, recreation, shopping areas, a college and a major addition to Boston’s open space network.” The Southwest Corridor development plan “consists of the following major non-transportation development: . . . [85] acre Regional Park System that will serve as a major addition to the Olmstead Emerald Necklace of parks in Boston; completion date 1985.” The urban area benefits also included economic development. The catalyst for this development “is, of course, the planned transportation improvements.” The City of Boston planned “capital improvements adjacent to the corridor in order to upgrade the neighborhoods.” The planned projects were “largely institutional (schools, community facilities, etc.) or recreational (playgrounds, open space).”
A letter from the UMTA to the MBTA (which appears to be dated July 9, 1984) expresses concern over a proposed interagency agreement between the MBTA and the MDC regarding the anticipated transfer of land within the Southwest Corridor Project. The UMTA was concerned that there was no indication whether transfer of title to the land was necessary “for the MDC to perform its function of providing public park and recreational facilities on any land proposed to be transferred.” The UMTA was also concerned that it may be entitled to the fair market value of the transferred land. Finally, and most significantly for this decision, the UMTA was concerned that “if the land transferred to the MDC is designated parkland, question arises as to whether it would be available to the MBTA for future transportation improvements, if such improvements would interfere with the land’s potential for actual park or recreational use by members of the public.” This concern arose because of then-existing Federal law. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 411 (1971) (citing 23 U.S.C. §138 (1964 ed., Supp. V) and 49 U.S.C. § 1653(f) (1964 ed., Supp. V)) (“This language is a plain and explicit *494 bar to the use of federal funds for construction of highways through parksonly the most unusual situations are exempted”). The letter also states:
While UMTA has always taken steps to minimize any environmental damage, and to mitigate adverse impacts, I am concerned that an unrestricted transfer of land to the MDC could have the effect of preventing the MBTA from constructing additional and otherwise necessary and desirable improvements within the corridor if those improvements could be shown to adversely affect a newly created park or recreational use. Therefore, it is essential that the deed, and any agreement related to the transfer and use of the affected property, entered into by and between the MBTA and the MDC specifically state that the properly is impressed with a primary transportation use, and that Section 4(f) of the Department of Transportation Act of 1966 (49 USC 1653(f)) will not apply to any future transportation project undertaken by the MBTA with respect to that land.
In 1999, Amtrak was working to electrify the railway adjacent to the Park, as part of its Boston to New York high-speed rail service. Amtrak vehicles and equipment sometimes blocked portions of the bike path. In addition, the fence adjacent to the tracks had to be repaired after Amtrak’s work was completed in the Fall of 1999. The bike path was at times blocked during this repair.
DISCUSSION
The court allows summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). On matters for which the moving party does not bear the burden of proof at trial, the moving party may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the moving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass at 17. In deciding a motion for summary judgment, the court should not weigh evidence, assess credibility, or find facts and may only consider undisputed material facts and apply the law to them. See Kelley v. Rossi, 395 Mass. 659, 663 (1985).
At the relevant time, the recreational use statute, G.L.c. 21, §17C, provided in relevant part:[8]
An owner of land who permits the public to use such land for recreational purposes without imposing a charge or fee therefor, or who leases his land for said purposes to the commonwealth or any political subdivision thereof shall not be liable to any member of the public who uses such land for the aforesaid purposes for injuries to person or property sustained by him while on said land in the absence of wilful, wanton or reckless conduct by such owner, nor shall such permission be deemed to confer upon any person so using said land the status of invitee or licensee to whom any duty would be owed by said owner.
Defendants argue that the recreational use statute governs plaintiffs claim because the Park is open to the public for recreational purposes without a fee. Plaintiff argues that the recreational use statute does not apply because the defendants do not own the Park and because the Park is part of a transportation corridor and plaintiff was not using the land for recreational purposes. Alternatively, plaintiff argues that if the statute does apply, a dispute exists as to a material fact, viz., whether defendants’ conduct was reckless.
The Ownership Issue
By its terms, the recreational use statute, as it existed at the time of plaintiffs accident, protects only an “owner of land” from negligence claims.[9] Defendants have not sustained their summary judgment burden of showing that the undisputed facts establish that they are “owners” for purposes of the recreational use statute. In fact, the record appears to establish the contrary, that the MBTA owns the land. Defendants have not argued that they are entitled to the protection of the recreational use statute even if they are not the agency which owns the land. In any event, this disputed factual issue itself prevents a ruling on summary judgment that the recreational use statute applies to protect defendants from negligence-based liability.
The Recreational Use Issue
Although the ownership issue prevents me from ruling on the applicability of the recreational use statute, the parties have briefed in depth another issue, whether the Park is used for “recreational purposes.” Given the extent of the parties’ briefing, I make several observations.
In general, the recreational use statute “exempts an owner of land who permits the public to use the land for recreational purposes without charge from negligence-based liability to persons injured while using the Iand/or those purposes.” Catanzarite v. Springfield, 32 Mass.App.Ct. 967, 967 (1992) (emphasis added). “It is not the nature or quality of the land or the uses to which it is put by its owners, but the nature of the use the public makes of it, i.e., recreational activity, that determines the applicability of G.L.c. 21, §17C.” Forbush v. Lynn, 35 Mass.App.Ct. 696, 702 n.10 (1994).
Case law as to what constitutes a “recreational use” under this statute is sparse. In Catanzarite, the plain *495 tiff was injured while viewing an exhibit of dinosaur tracks. The case was put to the jury on the special question, among others, of whether the plaintiff was using the land for recreational purposes. On appeal, the plaintiff argued that as a matter of law she could not have been found to have used the land for recreational purposes. The Appeals Court held:
“Recreation” in its most natural signification means “refreshment of strength and spirits after work; . . . a means of refreshment or diversion.” Webster’s New Collegiate Dictionary 966 (1977). This would include not only the active pursuits (playing baseball and the like)... but also passive pursuits, such as watching baseball, strolling in the park to see animals, flowers, the landscape architecture, or other sights, picnicking, and so forth; there is no tenable line that would exclude the reviewing of exhibits such as dinosaur tracks.
Id. (emphasis in original). See Seich v. Canton, 426 Mass. 84, 85 n.4 (1997) (quoting language from Catanzarite).
Other provisions of the General Laws defining “recreational use” are consistent with this interpretation. See G.L.c. 61B, §1 (relating to taxation of recreational land)[10]; G.L.c. 44B, §2 (Massachusetts Community Preservation Act).[11]
Plaintiff argues that given the history of the Park it is not a recreational facility but a transportation corridor. The facts in the summaryjudgment record tend to indicate that the public is permitted to use the Park for recreational purposes. The terms of the recreational use statute do not require that the only permitted use of the land be recreational.
The statute, however, does require that a plaintiff have used the land for recreational purposes. This would seem to require that a plaintiff be on the land and using the land for recreational purposes at the time of the injury, although there is no requirement that an injury be causally related to that recreational use. Catanzarite, 32 Mass.App.Ct. at 967.
Defendants argue that an objective test should be used to determine whether the recreational use statute applies. Under this test, the relevant inquiry is not into the type of use a person is engaged in but the character of the property and the type of activities for which the property is held open to the public. See Iannotti v. Consolidated Rail Corp., 74 N.Y.2d 39, 47 (1989); Riksem v. Seattle, 47 Wash. App. 506, 512 (1987); Goodluck v. Findlay, No. 5-98-36 (Ohio Ct.App. Mar. 3, 1999), 1999 WL 156033 (unpublished opinion).[12] But see Farnham v. Kittinger, 83 N.Y.2d 520, 527-28 (1994) (for noninherently recreational motorized vehicles, courts must assess intent of the land users to determine if user had recreating purpose); Bragg v. Genesee County Agricultural Society, 84 N.Y.2d 544, 551-52 & n.3 (1994) (applying Farnham). The terms of the Massachusetts recreational use statute may advise against such an interpretation. See Forbush, 35 Mass.App.Ct. at 702 n.10, quoted above. In addition, although defendants assert that bicycling is "an inherently recreational activity,” the Supreme Judicial Court has recognized that one may ”us[e] a bicycle as a means of transportation rather than recreation.”[13] Opinion of the Justices to the Senate, 370 Mass. 895, 897 (1976).
Defendants argue that a rule that the statute does not apply when a person uses the path to bicycle to work would be anomalous, because a different standard would apply to persons engaged in the same activity (bicycling) with different destinations or points of origin. It is true.that such a rule would result in broader liability for landowners for persons bicycling to work than those bicycling for recreation. Such a rule may, however, be faithful to the language of the statute. Moreover, the recreational use statute is no stranger to anomalous results. See Forbush, 35 Mass.App.Ct. at 702 (municipalities enjoy substantially lesser degree of responsibility for children playing on public land than for trespassing children).
A determination that the recreational use statute, before the recent amendment, makes relevant a person’s use of the land, i.e., whether for recreational purposes, would be limited because the 1998 amendment to the statute appears to have omitted this element. St. 1998, c. 268 (a landowner who “lawfully permits the public to use [described] land for recreational, conservation, scientific, educational, environmental, ecological, research, religious, or charitable purposes without imposing a fee therefor . . . shall not be liable for personal injuries or property damage sustained by such members of the public . . . while on said land . . .”).
Finally, I note that even if the recreational use statute does apply to this case, it is by no means clear from the undisputed facts that defendants are not liable for wilful, wanton or reckless conduct. The factual basis for plaintiffs claim is not defendants’ inaction, but defendants’ affirmative conduct. Cf. Sandler v. Commonwealth, 419 Mass. 334, 336 (1995) (case involving reckless failure to act).
Conclusion
To summarize, defendants have not sustained their summaryjudgment burden of showing that the undisputed facts establish that the recreational use statute applies, because defendants have not shown they own the land. Summaryjudgment is denied for this reason. My remaining observations do not constitute rulings of law in this case; a different factual record may counsel a different result.
ORDER
For the foregoing reasons, defendants’ motion for summaryjudgment is DENIED.

 As this is a motion for summary judgment, plaintiff is incorrect in his assertion that he “is entitled to the presumption that everything pleaded in the complaint is true ...” *496 Neither the original complaint nor the amended complaints are verified.

 Defendants refer to this as a “park” while plaintiff calls it a “bicycle path.” Statute 1990, c. 335, directs the MDC “to designate certain park land located . . . within the Southwest Corridor, so-called, as the Southwest Corridor park.” I therefore refer to the land as the “Park.”

 In his response to defendants’ statement of undisputed material facts, plaintiff states that the Park is owned by the MBTA. In their supplemental memorandum in support of summary judgment, defendants do not dispute this. In support of his assertion, plaintiff cites an agreement signed January 30, 1990 and February 23, 1990, titled ‘Transfer of Properties from The [MBTA] to The [MDC] of Parklands Abutting the Southwest Corridor Transportation Right of Way.” This agreement states the MBTA’s intent to transfer to the MDC the Parkland “in fee simple, as easements, or under licenses.” Summarized, those portions of the agreement state in relevant part as follows.
The MDC and MBTA acknowledged the need for cooperation in the transfer of Southwest Corridor Parkland from the MBTA to the MDC and the need to define their responsibilities relative to the ongoing “operation of the MBTA transportation corridor and maintenance and use of the Parkland.”
As to those parcels to be transferred in fee simple, “the MBTA will convey all of its right, title, and interest to the MDC to use as open space” subject to conditions and reservations. The MBTA would “reserve to itself permanent easements . . . for maintenance of transportation facilities, emergency egress, and utilities purposes, and the right at any time to construct future transportation projects, as defined in [G.L.c. 161A], and to have a reconveyance of land necessary therefor." The Commonwealth and the City of Boston (and their agencies) would have “permanent access” to inspect, maintain, repair, clean and remove snow “from streets, alleyways, sidewalks and street bridges under their ownership and control” and to inspect, maintain, repair and clean street drainage facilities, lighting systems and water supplies. The conveyance would be subject to any restrictions or reservations placed on it by the Legislature.
The MBTA granted the MDC “the right and obligation to operate and maintain the Deck Parcels [i.e., parcels located above the transit and railroad right of way] as open space.” The MDC would be responsible for the care and control of the Deck Parcels to a depth of two feet, subject to certain restrictions, including limitations of vehicular traffic to emergency cars and light maintenance trucks. “The MDC’s easement for open space is subject to the MBTA’s right to maintain the deck structure and transit corridor including emergency exit hatches; to pass and repass over the Deck; to construct future transportation projects as defined herein and to have a release of easements if necessary for such purpose; and to any other restrictions the Legislature may place on the conveyance."
The MBTA granted the MDC a license to use certain parcels. One such parcel was the “Ruggles Street Station Area.” The MBTA granted the MDC
a license to utilize the land ... for park purposes, and an easement for a bicycle path as shown on [a plan not in the record], or as said bicycle path may be relocated in accordance with development plans for the area. The MBTA will be responsible for all repairs and maintenance except as hereinafter set forth; supplying electricity for parkland style lighting; and supplying water for the irrigation system, including payment for backflow preventer inspections. The MDC will be responsible for the maintenance of all plant material in this area. MDC will maintain and repair parkland-style benches and trash receptacles, parkland-style lights and the irrigation system including the backflow preventer. MDC will also be responsible for maintenance and repair of the bicycle path which shall include snow removal.
“Maintenance of plant material" was defined to mean “watering, mowing, fertilizing, thatching, pruning, mulching, seeding, rolling, leaf raking, replacement of dead plant material and maintenance of the irrigation system.”
The agreement stated the MBTA’s and the MDC’s intention to extend full authority to MDC and MBTA police officers over the Parkland.
The agreement references various appendices, which are not in the record.

 As with ownership of the land of the Park, there is apparently more subtlety than the parties’ statements of facts recognize. See n.4 supra.

 Defendants maintain that the bike path is lighted at night.

 The affidavit of Thomas Yovicisn (MDC’s Depuiy Superintendent for the Southwest Corridor Park since 1988) states: “Other than plaintiffs accident, which he claims was caused by the placement of mulch in the bike path, I cannot recall any other accidents on the bike path caused by obstructions in the bike path.” Par. 8.

 The statute was amended by St. 1998, c. 268. Statute 1972, c. 575, as amended by St. 1991, c. 372, controls this case.

 The most recent amendment to the statute protects “[a]ny person having an interest in land.” G.L.c. 21, §17C, as amended by St. 1998, c. 268. “Person” includes “the person having an interest in the land, his agent, manager, or licensee and shall include without limitation, any governmental body, agency or instrumentality, nonprofit corporation, trust or association, and any director, officer, trustee, member, employee or agent thereof.” Id. “As a general rule, statutes operate prospectively unless a contraiy legislative intent is clearly shown.” Nantucket Conservation Found., Inc. v. Russell Mgt., Inc., 380 Mass. 212, 214 (1980). Defendants have referred this court to no material which would indicate that the Legislature intended this amendment to operate retroactively. Defendants concede that the recreational use statute, as it appeared before the recent amendment, governs in this case.

 “For the purpose of this chapter, the term recreational use shall be limited to the following: hiking, camping, nature study and observation, boating, golfing, horseback riding, hunting, fishing, skiing, swimming, picnicking, private noncommercial flying, including hang gliding, archery and target shooting.” G.L.c. 61B, §1, as inserted by St. 1979, c. 713, §1. Statute 1998, c. 194, §120 added “non-commercial youth soccer.”

 Recreational use means “active or passive recreational use including, but not limited to, the use of land for community gardens, trails, and noncommercial youth and adult sports, and the use of land as a park, playground or athletic field. ‘Recreational use’ shall not include horse or dog racing or the use of land for a stadium, gymnasium or similar structure.” G.L.c. 44B, §2, as inserted by St. 2000, c. 267, §1.

 In Vinar v. Bexley, No. 00AP-1134 (Ohio Ct. App. Apr. 19, 2001), 2001 WL 393722, the Court of Appeals of Ohio, on facts bearing some resemblance to this case, held that no immunity was available to a city. There, in contrast to this case, the property was “a roadway, available to the general public for travel by vehicles and bicycles, which happens to be a thoroughfare through a park.”

 In their supplemental memorandum, defendants appear to suggest that plaintiff had the dual purposes of recreation and transportation when he used the Park. This is without a basis in the factual record presently before me.